# United States Court of Appeals for the Federal Circuit

2008-7162


LEE P. ADAMS,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.


Marshall O. Potter, Jr., of Vienna, Virginia, argued for claimant-appellant.

Meredyth Cohen Havasy, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellee. With her on the brief were Jeanne E. Davidson, Director, and Martin F. Hockey, Jr., Assistant Director. Of counsel on the brief were David J. Barrans, Deputy Assistant General Counsel, and Amanda R. Blackmon, Attorney, United States Department of Veterans Affairs, of Washington, DC.

Appealed from: United States Court of Appeals for Veterans Claims

Judge Mary J. Schoelen

# United States Court of Appeals for the Federal Circuit

2008-7162

LEE P. ADAMS,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.

Appeal from the United States Court of Appeals for Veterans Claims
in 06-0095, Judge Mary J. Schoelen.

_____

DECIDED:  June 15, 2009

_____

Before NEWMAN, SCHALL, and BRYSON, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

When a veteran files a claim for disability compensation, that claim is regarded as pending until it is acted upon by the Department of Veterans Affairs ("DVA").  In some instances in which a veteran files several claims, or in which the veteran's claim is treated as constituting several separate claims, the DVA does not expressly act upon each of the claims.  In that setting, it is necessary to decide whether the unaddressed claim is still pending or has been implicitly denied.  The answer to that question is important because it can affect the effective date of the veteran's claim and the

standard to be applied if the veteran seeks, at some later time, to reassert the claim that was not expressly resolved.

In this case, the Court of Appeals for Veterans Claims ("the Veterans Court") held that a claim filed by the veteran, Lee P. Adams, was implicitly denied by a Veterans Administration regional office in 1951 and by the Board of Veterans' Appeals in 1952. The court rejected Mr. Adams's contention that the claim was never denied and therefore was still pending when Mr. Adams sought to reopen it in 1989. Mr. Adams now argues that the Veterans Court applied an incorrect legal standard in deciding that the Veterans Administration implicitly denied his claim in 1951 and 1952. We hold that the Veterans Court applied the correct standard, and we therefore affirm.

I

Mr. Adams served on active duty in the U.S. Air Force for approximately one month, from January 15, 1951, to February 16, 1951. A medical examination conducted when he entered the service did not disclose any heart abnormalities. Eleven days later, however, Mr. Adams was admitted to an Air Force hospital for evaluation of a heart murmur that was detected during a physical examination performed upon his arrival at an Air Force base in San Antonio, Texas. Mr. Adams was hospitalized for about two weeks and diagnosed with inactive rheumatic valvulitis with deformity in the aortic valve. He was also suffering from a respiratory infection at the time.

After Mr. Adams was released from the hospital, a military medical board determined that he had rheumatic heart disease that preexisted and was not aggravated by service. As a result of his heart condition, Mr. Adams was honorably discharged from the Air Force.

On April 23, 1951, Mr. Adams filed an application with the Veterans Administration seeking disability compensation for what he termed "rheumatic heart." In support of that claim, Mr. Adams submitted a medical report prepared by a private physician whom Mr. Adams consulted when he became ill again shortly after his discharge. The physician diagnosed Mr. Adams with "rheumatic valvular heart disease, aortic insufficiency, and mitral insufficiency," as well as a fresh respiratory infection. In a June 1951 decision, a Veterans Administration regional office denied Mr. Adams's claim for benefits on the ground that he had no active symptoms of "rheumatic valvulitis or associated disease" during his service.

Mr. Adams continued to complain of severe chills and fever, and on his physician's recommendation he was hospitalized in a Veterans Administration facility from May to August 1951. A hospital report dated August 1951 listed two diagnoses: (1) "Rheumatic heart disease, active, aortic insufficiency, cardiac enlargement, myocardial disease, myocardial insufficiency," and (2) "Subacute bacterial endocarditis, due to streptococcus mitis, secondary to [his rheumatic heart disease]." The regional office reviewed the hospital report but concluded that it did not contain any new and material evidence as to the issue of service connection for Mr. Adams's heart condition. The regional office therefore again denied his claim for disability compensation.

On October 11, 1951, Mr. Adams submitted an affidavit to the regional office in which he referred to the hospital report and the diagnoses of rheumatic heart disease and subacute bacterial endocarditis listed in the report. The regional office reconsidered his claim for disability compensation based on the affidavit but again determined that no change in the previous disallowance decision was warranted.

Mr. Adams appealed from the regional office's decisions, contending that he was entitled to service connection for a "heart condition." The Board of Veterans' Appeals denied the appeal on March 4, 1952. The Board noted that it had considered the entire record, including the August 1951 hospital report and the October 1951 affidavit. The Board concluded that the "medical records do not disclose active rheumatic fever or other active cardiac pathology during service" and that Mr. Adams's "rheumatic valvulitis" was incurred prior to and not aggravated during his military service.

Nearly 40 years later, on February 2, 1989, Mr. Adams submitted a request to reopen his claim for disability compensation based on additional medical evidence. The Board conducted a hearing and determined that the issue for consideration was more appropriately characterized as a claim for "entitlement to service connection for endocarditis residuals." After further proceedings before the regional office, the Board on February 7, 1997, awarded Mr. Adams service connection for "heart disease, claimed as residuals of endocarditis, including heart valve damage." Specifically, the Board found that Mr. Adams had congenital heart disease with a bicuspid aortic valve when he entered the service. That preexisting condition predisposed him to bacterial endocarditis, which the Board found he incurred while in the service and which resulted in additional heart valve damage. The regional office ultimately assigned an effective date for the grant of service connection of January 19, 1989, the date on which Mr. Adams was admitted to a veterans hospital for treatment of a heart condition. See 38 C.F.R. § 3.157(b)(1).

Dissatisfied with the effective date that was assigned to his award of benefits, Mr. Adams asked the Board to assign him an earlier effective date. The linchpin of Mr.

Adams's argument was that his 1951 claim for endocarditis remained pending until the Board's 1997 decision that awarded him service connection for heart disease; for that reason, Mr. Adams contended, he was entitled to an effective date of February 17, 1951, the day after his separation from service. See 38 U.S.C. § 5110(a), (b)(1). The Board rejected that argument, concluding that there was no pending claim for service connection for heart disease after the Board's 1952 decision.

Mr. Adams took an appeal to the Veterans Court, which accepted Mr. Adams's argument that he had filed two distinct claims for service connection in 1951: a formal claim for rheumatic heart disease and an informal claim for endocarditis. Nonetheless, the court concluded that the regional office's 1951 decision regarding Mr. Adams's formal claim for rheumatic heart condition had implicitly denied Mr. Adams's informal claim for service connection for endocarditis. The court therefore affirmed the Board's denial of an effective date earlier than January 19, 1989, on the ground that Mr. Adams had no pending claim for service connection prior to that date. Mr. Adams appeals.

II

The rules for determining the effective date of a veteran's claim for benefits are not in dispute. Generally, the effective date for an original claim is the date that the DVA receives the claim or the date that the entitlement to the benefit arose, whichever is later. 38 U.S.C. § 5110(a). If a veteran files a claim within one year after separation from service, the effective date of the claim is the day after the veteran's discharge. Id. § 5110(b)(1). For an award based on a claim reopened after final adjudication, however, the effective date is typically the date that the DVA receives the request to reopen the claim (as opposed to the date of receipt of the original claim) or the date that

the entitlement to benefits arose, whichever is later.  Id. § 5110(a); 38 C.F.R. § 3.400(q)(2), (r); see generally Livesay v. Principi, 15 Vet. App. 165, 171-72 (2001).

A claim for benefits, whether formal or informal, remains pending until it is finally adjudicated.  38 C.F.R. § 3.160(c); see Richardson v. Nicholson, 20 Vet. App. 64, 72 n.8 (2006).  A claim will also be considered to be pending if the DVA has failed to notify the claimant of the denial of his claim or of his right to appeal an adverse decision.  Cook v. Principi, 318 F.3d 1334, 1340 (Fed. Cir. 2002) (en banc).  If a claim is left pending, it can be addressed when a subsequent claim for the same disability is adjudicated by the DVA, in which case the effective date for any award of benefits will be the effective date applicable to the original claim.  See Myers v. Principi, 16 Vet. App. 228, 236 (2002).

The dispute in this case turns on whether Mr. Adams's informal claim for service connection for endocarditis was denied by the regional office in October 1951.  If the regional office considered and denied the endocarditis claim in 1951, that claim became final after the Board's 1952 affirmance, and Mr. Adams is not entitled to an effective date of 1951 for his endocarditis claim.  However, if the regional office did not adjudicate the endocarditis claim in 1951, that claim remained pending when Mr. Adams filed the renewed claim in 1987 that ultimately led to the award of benefits.  In the latter case, Mr. Adams would be entitled to an effective date of 1951, the year in which he was discharged from service and in which he made his original claim for benefits.

Applying our decision in Deshotel v. Nicholson, 457 F.3d 1258 (Fed. Cir. 2006), and its own decision in Ingram v. Nicholson, 21 Vet. App. 232 (2007), the Veterans Court found that the 1951 endocarditis claim was implicitly denied as part of the action

the Veterans Administration took on his related claim for rheumatic heart disease. For that reason, the Veterans Court concluded that Mr. Adams was not entitled to a 1951 effective date for his claim. Because, with the exception of constitutional issues, we cannot review decisions of the Veterans Court with respect to factual issues or the application of law to fact, 38 U.S.C. § 7292(d)(2), the principal question before us is whether the Veterans Court applied the correct legal standard when it determined that the Veterans Administration implicitly denied the 1951 endocarditis claim.

A

The "implicit denial" rule provides that, in certain circumstances, a claim for benefits will be deemed to have been denied, and thus finally adjudicated, even if the DVA did not expressly address that claim in its decision. One such circumstance is illustrated by our decision in <u>Deshotel</u>. Mr. Deshotel filed a claim in 1984 for disability compensation for the residuals of a head injury. The regional office issued a decision in 1985 granting service connection for head trauma. Although the regional office did not explicitly decide Mr. Deshotel's claim for compensation based on a psychiatric disability, it noted that Mr. Deshotel's physical examination showed no evidence of a psychiatric condition. In 1999, Mr. Deshotel sought disability compensation for a psychiatric condition secondary to his head trauma. The regional office treated that application as a request to reopen based on new and material evidence, and it awarded service connection for the psychiatric condition with an effective date of 1999.

Mr. Deshotel appealed, seeking to have the date on which he filed his 1984 application declared the effective date for his compensation benefits. He argued that the DVA was required to treat his initial application as including an informal claim for a

psychiatric condition and that his psychiatric claim remained open because the regional office did not explicitly address that claim in its 1985 decision. We rejected that argument and ruled that the 1985 decision constituted a final adjudication of the psychiatric claim under the implicit denial rule. We explained: "Where the veteran files more than one claim with the RO at the same time, and the RO's decision acts (favorably or unfavorably) on one of the claims but fails to specifically address the other claim, the second claim is deemed denied, and the appeal period begins to run." 457 F.3d at 1261.

In Ingram v. Nicholson, the Veterans Court elaborated on the test set forth in Deshotel for determining when a claim not expressly addressed by the DVA will be deemed to have been denied. Mr. Ingram filed a claim in 1986 for non-service-connected pension benefits after his lung was removed at a veterans hospital. The regional office denied that claim because it concluded that Mr. Ingram's condition was not shown to be permanent. In 1992, Mr. Ingram filed a claim for benefits under 38 U.S.C. § 1151, which provides benefits to veterans injured by DVA hospital, medical, or surgical care. He asserted that he had developed an esophageal leak as a result of the lung-removal surgery. The Board awarded him compensation under section 1151, but it denied his request for an effective date earlier than 1992 because it concluded that his 1986 application for pension benefits did not also include a claim for benefits under section 1151.

On appeal, the Veterans Court characterized the issue as whether the regional office implicitly denied any claim under section 1151 when it adjudicated his claim for pension benefits but did not explicitly address section 1151. Ingram, 21 Vet. App. at

243. Citing Deshotel, the Secretary argued that whenever multiple claims are filed at the same time an adjudication of one claim without mention of the other necessarily results in an adjudication of the second claim, regardless of the nature of the claims made or the type of benefits sought. The Veterans Court rejected that interpretation of Deshotel as overly broad and held that the regional office's decision granting Mr. Ingram's claim for pension benefits did not implicitly deny his section 1151 claim.

The court held that, unlike the claims at issue in Deshotel, Mr. Ingram's section 1151 claim was "in no way related to" his claim for non-service-connected pension; instead, each of his claims was "separately statutorily based and defined." Ingram, 21 Vet. App. at 247. Moreover, while the regional office's original decision denied Mr. Ingram's claim for pension benefits because he did not establish that he was permanently disabled, an award of disability compensation under section 1151 does not require that a disability be permanent. Thus, the regional office's explanation of its rejection of Mr. Ingram's non-service-connection claim for pension benefits did not give Mr. Ingram reasonable notice that it was also rejecting his claim for disability compensation under section 1151. Consequently, the Veterans Court held that the regional office's 1986 decision did not constitute an implicit denial of any pending section 1151 claim. Id. at 247-48, 255.

B

Mr. Adams does not take issue with the implicit denial rule applied in Deshotel and Ingram. Rather, he asserts that the Veterans Court misinterpreted those decisions and therefore used an incorrect legal standard when it applied the implied denial rule in this case. We disagree. Nothing in the Veterans Court's decision in this case suggests

that it departed from the rationale of the implicit denial rule or that it failed to focus on the proper considerations bearing on the application of that rule in settings such as the one in this case.

Mr. Adams contends that <u>Deshotel</u> stands for the proposition that "claims must have been made at the same time in order for one to be 'deemed denied' when the other was acted on." Because the formal and informal claims in this case were not filed simultaneously, he argues that under <u>Deshotel</u> the informal claim, as a matter of law, cannot have been implicitly denied when the formal claim was denied.

That argument is based on a basic flaw in reasoning. The veteran in <u>Deshotel</u> was considered to have filed more than one claim at the same time. In that setting, the court held that when the regional office acted on one of the claims, the second claim was deemed denied and the appeal period began to run. 457 F.3d at 1261. But in this instance, as in many others, the inverse of a true proposition is not necessarily true. <u>See</u> <u>Capitol Records, Inc. v. Naxos of Am., Inc.</u>, 372 F.3d 471, 480 (2d Cir. 2004). Thus, the fact that the claims were not filed at the same time does not mean that the implicit denial rule does not apply.

Based on its prior decision in <u>Ingram</u>, the Veterans Court held that when a regional office decision "discusses a claim in terms sufficient to put the claimant on notice that it was being considered and rejected, then it constitutes a denial of that claim even if the formal adjudicative language does not 'specifically' deny that claim." <u>Adams v. Peake</u>, No. 06-0095, slip op. at 5 (Vet. App. Feb. 20, 2008), quoting from <u>Ingram</u>, 21 Vet. App. at 255. That principle is consistent with the decision in <u>Deshotel</u>, and when applied to cases in which the DVA's decision is clear but not expressed, it reflects an

appropriate balance between the interest in finality and the need to provide notice to veterans when their claims have been decided.

In applying the implicit denial rule, the Veterans Court properly looked first to the language of the Veterans Administration's 1951 and 1952 decisions to determine whether they provided sufficient information for a reasonable claimant to know that he would not be awarded benefits for his asserted disability. The court pointed out that the October 1951 decision denying Mr. Adams's application for benefits specifically stated that the regional office had considered his affidavit, which expressly referred to both rheumatic heart disease and subacute bacterial endocarditis. Thus, although the 1951 decision expressly addressed only Mr. Adams's formal claim for rheumatic heart disease, the court held that the decision alluded to the underlying claims in a manner that put Mr. Adams on notice that his informal claim for bacterial endocarditis based on the referenced affidavit was also denied. Moreover, as the court further explained, Mr. Adams's appeal to the Board referred to his "heart condition," a general characterization that encompassed both his rheumatic heart disease and bacterial endocarditis claims. And in its decision, the Board explicitly noted that it had reviewed Mr. Adams's hospital reports and his affidavit, but found that those records "do not disclose active rheumatic fever <u>or other active cardiac pathology</u> during service" (emphasis added). Applying the <u>Ingram</u> standard, the court held that in those circumstances the regional office's decisions in 1951 and the Board's decision in 1952 "reasonably informed the appellant that a claim for any heart condition, including endocarditis, was denied." <u>Adams</u>, slip op. at 6.

The facts of Deshotel are similar in this regard. In Deshotel, the regional office noted, when it granted service connection for a head injury, that the claimant's medical examination showed no evidence of psychiatric symptomatology. Under those circumstances, a reasonable veteran would have known that his claim for disability compensation for a psychiatric condition was denied.

Another factor bearing on whether an adjudication that specifically addresses one claim implicitly denies another is the relatedness of the claims. The conditions for which Mr. Adams sought service connection in 1951 are closely related. Rheumatic heart disease and bacterial endocarditis both affect heart valves, and bacterial endocarditis is frequently associated with rheumatic heart disease because the damage to heart valves caused by rheumatic valvulitis predisposes them to infection. Furthermore, the hospital report considered by the regional office and the Board explicitly referred to Mr. Adams's bacterial endocarditis as "secondary" to his rheumatic heart disease.

Once again, the facts of Deshotel are similar. The claimant sought service connection for two conditions that were closely related: a head injury, and a psychiatric disability resulting from that head injury. By contrast, the court in Ingram noted that the claimant's section 1151 service connection claim was unrelated to his claim for non-service-connected pension benefits.

The timing of the claims is also highly significant. As noted, in Deshotel we applied the implicit denial rule in a situation in which the veteran was deemed to have filed more than one claim at the same time and the regional office's decision specifically adjudicated one claim but failed to address the other. 457 F.3d at 1261. In this case,

although Mr. Adams's informal claim for bacterial endocarditis was filed roughly six months after he filed his initial claim for service connection for rheumatic heart, the two claims were closely associated both in time and in the manner in which they were presented to the Veterans Administration.

When we addressed the specific case of claims filed at the same time in Deshotel, we did not suggest that the implicit denial rule is limited to situations in which the veteran files multiple claims in a single application. As the Veterans Court noted in Ingram, veterans benefits litigation typically proceeds in a piecemeal fashion. 21 Vet. App. at 253. The regional office attaches a single file number to all claims filed by a claimant, even if those claims are filed at different times. And claimants typically do not submit information in a single document, but "submit a continuous stream of evidence and correspondence" that may be pertinent to one or more claims. Id. at 254. That is particularly true in the case of informal claims for benefits, which can be based upon "any communication or action" indicating an intent to apply for benefits, even correspondence that does not come from the claimant himself. See 38 C.F.R. § 3.155(a); see also Moody v. Principi, 360 F.3d 1306, 1310 (Fed. Cir. 2004) (discussing the DVA's duty to determine all potential claims raised by the evidence).

Any interpretation of the implicit denial rule that rests on a requirement that the veteran's claims be filed simultaneously in a single document ignores the fact that veterans can submit information pertaining to a single claim at different times, and that the regional office often adjudicates distinct claims that were filed at different times in a single decision. As the Veterans Court noted in Ingram and in this case, the key question in the implicit denial inquiry is whether it would be clear to a reasonable person

that the DVA's action that expressly refers to one claim is intended to dispose of others as well.

Mr. Adams contends that his case is distinguishable from <u>Deshotel</u> because in that case the veteran failed to appeal a decision by the regional office to the Board, whereas in this case, he timely appealed the regional office's denial of his claim. As the Veterans Court explained, however, that distinction is meaningless. The implicit denial rule is not limited to cases in which the veteran failed to appeal a decision to the Board. Rather, the implicit denial rule applies where a regional office's decision provides a veteran with reasonable notice that his claim for benefits was denied. Whether or not the regional office's decision was appealed has no bearing on the reasonableness of the notice afforded by that decision. In sum, we reject Mr. Adams's contention that the Veterans Court's decision in this case departed from the proper standard for applying the implicit denial rule, as set forth and applied in <u>Deshotel</u> and <u>Ingram</u>.

III

Mr. Adams further contends that the Veterans Court's application of the implicit denial rule violated his due process right to receive fair notice of the regional office's decision denying his claim for benefits. We reject that argument. As discussed above, the implicit denial rule is, at bottom, a notice provision. In this case, the regional office's decision put Mr. Adams on notice that his claim for service connection for bacterial endocarditis was denied. Because Mr. Adams received adequate notice of, and an opportunity to respond to, the regional office's decision, he was not deprived of any due process rights that he asserts were implicated by his application for benefits.

Each party shall bear its own costs for this appeal.

AFFIRMED.